# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### AUGUST SESSION, 1998

**FILED**

October 30, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 01C01-9802-CC-00065** |
| | ) | |
| Appellee, | ) | |
| | ) | **CANNON COUNTY** |
| **V.** | ) | |
| | ) | |
| | ) | **HON. DON ASH, JUDGE** |
| **THOMAS MICHAEL DAVENPORT,** | ) | |
| | ) | **(REVOCATION OF** |
| Appellant. | ) | **SUSPENDED SENTENCE)** |

FOR THE APPELLANT:         FOR THE APPELLEE:

**GUY R. DOTSON, JR.**         **JOHN KNOX WALKUP**
102 South Maple Street         Attorney General & Reporter
Murfreesboro, TN  37130

                                         **TIMOTHY BEHAN**
                                         Assistant Attorney General
                                         2nd Floor, Cordell Hull Building
                                         425 Fifth Avenue North
                                         Nashville, TN  37243

                                         **WILLIAM C. WHITESELL, JR.**
                                         District Attorney General

                                         **JOHN W. PRICE, III**
                                         Assistant District Attorney General
                                         303 Rutherford County Judicial Bldg.
                                         Murfreesboro, TN  37130

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# OPINION

The Defendant, Thomas Michael Davenport, appeals as of right from the trial court's order revoking his probation. In this appeal, Defendant argues that the trial court erred by admitting into evidence a laboratory report in violation of his constitutional rights to confront and cross-examine witnesses and by concluding that the evidence was sufficient to show a violation of the terms of his probation. We affirm the judgment of the trial court.

On March 15, 1996, Defendant pled guilty to burglary in the Circuit Court of Cannon County. A sentencing hearing was subsequently held, and on August 16, 1996, the trial court entered an order sentencing Defendant to serve two (2) years in the Department of Correction. The sentence was then suspended and he was placed on intensive supervised probation. On August 12, 1997, a warrant was issued alleging that Defendant violated his probation by testing positive for marijuana on July 9, 1997, and on July 22, 1997. The trial court held a hearing on the probation violation warrant on October 6, 1997.

Christie McGee, an intern with the probation office in Murfreesboro, testified that one of her duties was to run drug screens on probationers. She was a senior at Middle Tennessee State University and had received training on performing drug screens and had passed a test on the procedure. She worked under the supervision of probation department personnel. She tested urine samples provided by the Defendant on July 9 and July 22, 1997. Both tests were positive for marijuana. The documentation of the screenings were admitted into evidence without objection from Defendant.

William James Scollon, an employee of the intensive supervision unit of the Department of Correction probation office in Murfreesboro, testified that Defendant was one of his probationers. He testified concerning his supervision of Ms. McGee in administering the drug screening test at the probation office. He also explained how the remaining portion of each specimen was placed into another cup, sealed, and initialed by the probationer. The cup was then placed in a pouch that was again sealed and then frozen until a courier could pick up the specimen to be transported for further testing by a laboratory.

Dr. Timothy Albert Robert, assistant laboratory director at Aegis Analytical Laboratories, Inc. in Nashville, Tennessee, testified that he has a Ph.D. in microbiotic medical science. Dr. Robert is responsible for the daily operations of all aspects of the laboratory. Among his duties, he serves as the certifying scientist for positive test results, reviewing all aspects of the testing. He explained that the Aegis Laboratory uses a reagent test system which generates quantitative test results. The sample is first tested on an Immunoassay test, and if that is positive, a Gas Chromatography/Mass Spectrometry test is administered on the specimen as confirmation. He further explained that specimens are received in the lab through a courier system and are processed by a receiving and accessioning staff who match up identification on the specimen with necessary paperwork, verify the intactness of seals, and log the demographics or patient information into the computer system of the lab. A portion of the specimen is then removed from the

container for analyzation by a licensed technologist in the laboratory. A chain of custody document is generated to account for all stages in the processing of the laboratory. In addition to training all of the staff and ensuring that quality assurance and control procedures are undertaken, Dr. Robert personally examines test results to make the determination of whether a test is positive or negative. He testified that he personally examined the test results involving the Defendant and certified them by affixing his signature to the report. Dr. Robert testified that he was familiar with the records of Aegis Laboratory and that he maintained those records in his custody.

The Defendant interposed an objection to the lab result being admitted into evidence. His counsel argued that the report was hearsay. Defendant argued to the trial court that even though Dr. Robert could certify the document from the technician, he could not certify that the test was conducted properly. Defendant argued that Dr. Black, who had also signed the report and had apparently performed the test, was not available to testify.

The reports of the laboratory were admitted into evidence over Defendant's objection as stated above. Each report states that the specimen was positive for marijuana at a concentration of greater than 135 nanograms per milliliter.

During cross-examination, the following colloquy occurred between defense counsel and Dr. Robert:

> Q.  I'm trying to make sure I've got this understood. The laboratory guy, whoever does the test, does the test, and he brings you a

> piece of paper showing you the results; is that really how
> it comes out?
>
> A.     Yes.  I have copies of the data with me, but I receive the original data as generated from the activities of the technicians and laboratory staff in the testing processes that occur in the laboratory.  So all of the data is accumulated and gathered and presented to me in what we call a job jacket, and I review all the components of the testing, the results, chain of custody documentation that is associated with the specimens that are undergoing analysis and the quality control data that's generated in association with those tests.  And if I find it acceptable by our laboratory established procedures, I then certify the results.

Dr. Robert confirmed that he was familiar with the technicians who perform the tests and with their various degrees of certification and training.

The Defendant testified and denied that he had used marijuana.  He admitted that he may have breathed some marijuana from second-hand smoke while he was in the presence of his sister who was smoking marijuana.

Dr. Robert was called in rebuttal by the State.  Without objection by defense counsel, Dr. Robert testified that he had read several articles which had appeared in scientific literature associated with studies addressing the issue of passive inhalation of marijuana smoke.  He testified that the studies showed that levels of specimens from people who had been subjected to passive inhalation were under 100 nanograms per milliliter.  He further testified that Chromatography/Mass Spectrometry results on Defendant's July 9 specimen had a value of 379 nanograms per milliliter.  He did not testify as to the specific level on the July 22 specimen.

On each written report from Aegis Laboratory which was admitted into evidence, Defendant had signed his name and dated the initial "chain of custody and

request form" directly below a printed statement on the form that included the language that Defendant certified that he provided the urine specimen to the collector and that the specimen was in the collection container marked with an identification number identical to the number on the form. The form further stated that the collection container was sealed with a tamper-evidence seal in his presence. Each of the reports had the correct identifying number.

Defendant relies primarily upon the cases of State v. Wade, 863 S.W.2d 406 (Tenn. 1993) and State v. Gregory, 946 S.W.2d 829 (Tenn. Crim. App. 1997), in arguing that the laboratory test results were erroneously admitted into evidence.

In Wade, our supreme court held that under the United States Constitution, the State is not entitled to revoke probation "based on an unidentified laboratory test admitted into evidence without a finding of good cause and proof of the reliability of the test report." 863 S.W.2d at 410. Furthermore, the supreme court held that the record in that case did not meet the minimal due process requirements of the Tennessee Constitution, Article I, Section 9. The court specifically held:

> The report was not admissible into evidence because there was no showing of good cause, and, had there been a showing of good cause, the revocation of probation based on the uncorroborated report which contains no significant indicia of reliability, could not be sustained.

Id.

The "good cause" refers to the denial of a defendant's right to confront and cross-examine the technician that prepared the report introduced into evidence. Id. at 409.

In Gregory, our court affirmed the revocation of probation by the trial court and distinguished the facts in that case from the factual situation in Wade. Specifically, in Gregory, the record identified the person who conducted the test, the method of testing, the tester's qualifications, the scientific reliability of the testing method, and that the test was conducted under established and reliable procedures. 946 S.W.2d at 832.

Furthermore, in Gregory, there was no live testimony of a certifying scientist of the laboratory. Instead, an affidavit of the "Certifying Scientist" was admitted into evidence certifying the result to be "reliable and accurate." In addition, the affidavit provided the qualifications of the person who certified the drug test, a specific description of the method of testing, a statement that the method was the most accurate test for the particular drug which tested "positive," a certification that the test results were reliable and accurate, and a declaration that all established procedures and protocols were followed. Id.

Despite Defendant's assertion that Dr. Black was the one who performed the test, our review of the lab report indicates that Dr. David L. Black, Ph.D., signed the report as a "director of laboratories." There was no specific testimony in the record as to the identity of the technician who actually performed the test.

Our court stated in Gregory as follows:

> Wade held that the state could not revoke probation based upon an **unidentified** laboratory report admitted into evidence without a finding of good cause as to the absence of the laboratory technician and proof of the reliability of the test report.

946 S.W.2d at 831, (emphasis added).

The laboratory reports admitted into evidence were identified through the testimony of Dr. Robert. In Wade, the State simply submitted an "unidentified" laboratory report as its sole evidence of violation of probation by the defendant. In Gregory, an affidavit of the "certifying scientist" from the laboratory was admitted along with the report of the laboratory results. As discussed above, Dr. Robert more than substantially complied with the requirements to establish the reliability of the laboratory report admitted into evidence. Implicit in his testimony was the fact that a qualified technician of Aegis Laboratories had performed the tests. The results from the raw data had been examined and approved by Dr. Robert. Defendant's counsel was allowed the opportunity to thoroughly cross-examine Dr. Robert, the "certifying scientist." Dr. Robert was able to specifically rebut the testimony of Defendant that his tests were positive from passive inhalation. The laboratory reports and the testimony of Dr. Robert were properly admitted into evidence and therefore we decline to grant Defendant relief on his first issue.

In his other issue, Defendant argues that the trial court erred in concluding the evidence was sufficient to show a violation of the conditions of his probation. As is usual, the conditions of probation required the Defendant to maintain "good and lawful conduct." During his testimony, Defendant acknowledged that he was aware that use of marijuana was illegal. The laboratory reports which were admitted into evidence, along with the initial positive drug screen results taken by the probation officers were sufficient evidence to justify revocation of probation. The trial judge does not need to find a violation of the terms of probation beyond a reasonable doubt. The evidence must only show that the judge has exercised a

conscientious judgment in making the decision rather than acting arbitrarily. Gregory, 946 S.W.2d at 832. The judgment of the trial court is not to be disturbed on appeal unless it appears that there has been an abuse of discretion where the record contains no substantial evidence to support the trial court's conclusion. State v. Leach, 914 S.W.2d 104 (Tenn. Crim. App. 1995).

We conclude that there was ample evidence to support the trial court's revocation of probation in this case. Accordingly, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
JOSEPH M. TIPTON, Judge

_____
JOE G. RILEY, Judge